IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

-------------------------------------------------------X
JACK HARRINGTON,

      Plaintiff,

-against-

JENNIFER CRAWFORD, as Superintendent of HILLSBORO-DEERING COOPERATIVE SCHOOL DISTRICT AND SCHOOL ADMINISTRATIVE UNIT #34, JAMES O'ROURKE, as Principal of HILLSBORO-DEERING HIGH SCHOOL, BRIAN McGINN, as Vice Principal of HILLSBORO-DEERING HIGH SCHOOL, and MICHAEL DETURRIS, as School Resource Officer of HILLSBORO POLICE DEPARTMENT,

      Defendants.
-------------------------------------------------------X

Case No. 1:25-cv-407

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff, Jack Harrington ("Plaintiff" or "Jack"), by and through his attorneys, Taylor Dykema PLLC, and Lehmann Major List, PLLC, brings this action against Defendants Jennifer Crawford ("Crawford"), as Superintendent of Hillsboro-Deering Cooperative School District and School Administrative Unit #34, James O'Rourke ("O'Rourke"), as Principal of Hillsboro-Deering High School (HDHS"), Brian McGinn ("McGinn"), as Vice Principal of HDHS, and Michael Deturris ("Deturris"), as School Resource Officer of Hillsboro Police Department (Crawford, O'Rourke, McGinn, and Deturris, together, "Defendants"), and alleges as follows:

**INTRODUCTION**

1. This is an action for declaratory judgment and nominal damages to vindicate Plaintiff's fundamental rights under the Fourth Amendment to the United States Constitution (U.S.

1

CONST. amend. IV), as incorporated against the states through the Due Process Clause of the Fourteenth Amendment (U.S. CONST. amend. XIV, § 1)

2. On April 24, 2025, Defendants—*based solely on Jack's status as a lawful firearms owner*—removed him from class at HDHS in front of his classmates during regular instruction. At Crawford's instruction, Defendants then subjected Jack to a coercive interrogation without his parents or an attorney present (the "Interrogation"), in which they demanded permission to search his truck (the "Subject Vehicle"), which was then parked in the HDHS campus parking lot, for firearms.

3. Neither Jack, nor his parents Thomas and Betsi (Jack, Thomas, and Betsi collectively, the "Harringtons") as the Subject Vehicle's owners, consented to a search of the Vehicle. Nonetheless, after the Interrogation in which Jack repeatedly refused to consent to a search and after Jack's parents were contacted by phone and similarly refused to consent to a search, Defendants searched the Subject Vehicle anyway, finding no firearm (the "Illegal Search"). At the time of the Illegal Search, Jack's legally owned firearm was safely stored at the Harringtons' home, nowhere near the school campus.

4. The Illegal Search was requested, demanded and ultimately executed without consent by Defendants based solely on their belief that Jack was a lawful gun owner.

5. Defendants had no reason to believe that Jack, on the day of the Illegal Search, or on any other occasion, had brought his lawfully owned and possessed firearm onto school property.

6. *The Interrogation and the Illegal Search occurred solely because of Jack's status as a lawful firearms owner*.

7. Defendants' conduct sets a dangerous and unacceptable precedent: that the lawful exercise of an individual's constitutionally guaranteed rights exposes the individual to groundless

2

searches and pre-search harassment.

8.      The Interrogation and the Illegal Search violated Jack's fundamental rights under the Fourth Amendment to the U.S. Constitution to be free from unreasonable searches and entitlement to a reasonable expectation of privacy. Specifically, Defendants' purported reason for the Illegal Search—Jack's status as a lawful owner of firearms—fell far short of "probable cause," but also the bare minimum of "reasonable suspicion" required to justify a school search.

9.      Accordingly, Plaintiff brings this action for declaratory relief and nominal damages.

## PARTIES

10.     Plaintiff, Jack, is an 18-year-old natural person, a citizen of the State of New Hampshire residing in the town of Deering, and a former student at HDHS, having graduated in June 2025. Jack is a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and/or use of firearms. At all relevant times herein, Jack was eighteen (18) years of age, and thus was and still is a lawful owner of a handgun (Glock 43). At all relevant times, Jack safely stored his firearm at the Harringtons' home.

11.     Defendant Crawford is the Superintendent of Hillsboro-Deering Cooperative School District and School Administrative Unit #34, and thus at all relevant times had supervisory authority over Defendants O'Rourke, McGinn, and Deturris.

12.     Defendant O'Rourke is the Principal of HDHS.

13.     Defendant McGinn is the Vice Principal of HDHS.

14.     Defendant Deturris is a school resource officer employed by the Hillsboro Police Department and assigned to HDHS at all material times herein.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges protected by the U.S. Constitution.

16. This action, based on violations of Plaintiff's rights under the U.S. Constitution, is brought under 42 U.S.C. § 1983 and seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and nominal damages, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

17. Since the validity of the Interrogation and Illegal Search are in dispute, there is an actual and justiciable controversy between the parties necessitating declaratory relief.

18. This Court has personal jurisdiction over the Defendants since they are each situated and/or reside within the District of New Hampshire.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because each of the Defendants are citizens of the State of New Hampshire, where this District is located; or, alternatively, under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## LEGAL BACKGROUND

20. Since 2017, New Hampshire has been a permitless carry (constitutional carry) state.

21. Open carry and concealed carry are legal in New Hampshire, for anyone at least eighteen years of age (N.H. Rev. Stat. Ann. § 159:12), who can legally possess a firearm.

22. Carry licenses are strictly optional in New Hampshire.

23. New Hampshire also allows individuals to carry or transport firearms in vehicles without a permit.

24. The applicable carry and transport statute, N.H. Rev. Stat. Ann. § 159:6(b)(III), provides:

> The availability of a license to carry a loaded pistol or revolver under this section or under any other provision of law *shall not be construed to impose a prohibition on the unlicensed transport or carry of a firearm in a vehicle, or on or about one's person*, whether openly or concealed, loaded or unloaded, by a resident, nonresident, or alien if that individual is not otherwise prohibited by statute from possessing a firearm in the state of New Hampshire.

(Emphasis added).

## FACTUAL ALLEGATIONS

### I.  Events Prior to April 24, 2025

25.  Sometime in April 2025, Jack had a conversation with another student about his legal firearms ownership while on a bus ride to a varsity baseball game (the "Bus Conversation"). At no time during the Bus Conversation did Jack make any threats, violate any laws, or speak inappropriately. Jack described an experience in which he had been pulled over by the police while driving on a public road, (while he was off campus and not on the way to or from school or any school sponsored activities), during which Jack had maturely and calmly informed the officer that his handgun was lawfully stored in the glove box of the vehicle he was driving. Jack also shared that he was nervous during the traffic stop, since he was new to carrying a firearm and did not have experience with such interactions. The Bus Conversation concluded with Jack's retelling of the fact that his encounter was largely uneventful and that the officer took no issue with Jack's legal possession of a firearm at the time.

26.  Sometime prior to April 24, 2025, Crawford, O'Rourke, and McGinn became aware of the Bus Conversation, or at least became aware of fragments of the Conversation, after one or more of the athletes on the bus had reported the Conversation to coaches, who then told O'Rourke.

27.  Notably, at no time did Jack tell anyone, including teammates or coaches, that (a) he intended to bring his handgun to the HDHS campus, (b) that he had ever brought his handgun to the HDHS campus, (c) that he intended to use his handgun in an unlawful manner, or (d) that

5

the interaction with the police officer occurred on the school campus or anywhere near the campus (it did not). Jack merely told his teammate(s) that his handgun had been in the glove box of the Subject Vehicle when he was driving on the single occasion in question (i.e., during the traffic stop), which, again, took place *off campus and outside of school hours*. The traffic stop was relatively uneventful, since after Jack informed the officer that he was in lawful possession of a firearm, the officer acknowledged Jack's statement and asked to see the Subject Vehicle's registration, which was also stored in the glove box at the time.

28. Accordingly, on and prior to April 24, 2025, Defendants had no probable cause or reasonable suspicion to support their search of the Subject Vehicle because there was no credible reason to believe that the handgun was in the Vehicle on that day, that Jack ever brought the handgun to school (he never did), or that he intended to bring his handgun to school. No part of the conversation between Jack and his teammate even suggested that Jack had ever or would ever bring a firearm to school.

29. Moreover, the traffic stop that Jack described occurred weeks before the Interrogation and the Illegal Search, which would not have given rise to any exigent circumstances or emergent need sufficient to justify a search.

30. As described in more detail below, Defendants took two data points, delivered to them through a high school rumor mill, to support their conclusion that Jack was in possession of a firearm on school property on April 24, 2025. Jack would confirm that a) he was a lawful firearms owner, and b) at some point, he had lawfully stored a firearm in the glove compartment of a vehicle. These two data points hardly gave rise to the bare minimum of "reasonable suspicion" necessary to justify a search.

II. **The Events of April 24, 2025**

31. On the morning of April 24, 2025, Jack drove to school in the Subject Vehicle, parked it in the HDHS parking lot, and attended his scheduled classroom instruction. Thomas and Betsi allowed Jack to use the Vehicle for his own transportation.

32. However, shortly after instruction had started, McGinn came to Jack's classroom and, in front of Jack's classmates, demanded that a bewildered Jack leave class and come to O'Rourke's office immediately.

33. After disrupting the school day and requiring Jack's presence in the office, O'Rourke, McGinn, and Deturris (the "Interrogators") commenced a full-court press Interrogation of Jack.

34. The Interrogators asked Jack about the Bus Conversation and informed him they had received information that he owned a handgun. After confirming with Jack that he "was a gun owner," the Interrogators asked Jack, "You have a gun in your truck sometimes, right?" Jack truthfully confirmed that he was an owner of firearms and that he *sometimes* transported a firearm in the Subject Vehicle, but also reiterated that he had never brought a firearm to school, and that he had no intention of doing so.

35. The Interrogators continued to lob questions at Jack for approximately fifteen minutes about his status as a firearms owner.

36. Deturris began to actively badger Jack, claiming that the Interrogators "had to" search the Subject Vehicle, admitting that Crawford had ordered a search, and that Jack had no choice in the matter, despite his repeated refusal to provide consent.

37. Deturris even told Jack, "You can say whatever you want, we're going to search it anyway."

38. Meanwhile, the Interrogators continued to pepper Jack repeatedly with the mantras

that they had "no choice" but to search the Subject Vehicle and that Jack *had to* consent since the search would be taking place.

39. Rather than comply with constitutionally mandated burdens of proof, which require reasonable suspicion that a crime is being committed to justify a school search, the Interrogators conducted their search based on an extrapolation from the facts that Jack was a lawful firearms owner and that he *sometimes* lawfully transported a firearm in his vehicle.

40. By the Interrogators' logic, any student who owns a firearm, or has *ever* lawfully carried a firearm on their person, in a bag, in their vehicle, or talked about doing so, would be subject to the same "mandatory" search.

41. Put bluntly: The Interrogators presented Jack with evidence that he had *followed* the law, but then used that evidence to suggest that he might break it.

42. The fact that the Interrogators felt the need to repeatedly demand Jack's consent for the Illegal Search was a tacit admission that they, in fact, *did not* have evidence sufficient to justify their search of the Subject Vehicle.

43. If the Interrogators believed they had reasonable suspicion for the Search, they would have simply conducted the search without interrogating Jack or perhaps requesting consent to a search once. Instead, the Interrogators conducted a fishing expedition in which the outcome was pre-determined. No matter how many times Jack refused consent, the Interrogators planned to search the Subject Vehicle and claim that Jack consented to the Illegal Search.

44. While still under withering harassment from the Interrogators, Jack called Thomas and Betsi and asked them, "What should I do?" He also informed them that the Interrogators could hear all the details of their telephone conversation since they were still in the room with Jack, and the call was on speakerphone. Jack then informed his parents multiple times that the Interrogators

8

"keep saying they have to search my truck, that they have no choice," and that the Interrogators "won't leave me alone," confirming the level of distress that Jack was experiencing from the Interrogation.

45. While on speakerphone and audible to the Interrogators, Thomas and Betsi calmly confirmed that neither Jack nor they would consent to a search of the Subject Vehicle, even after an audibly distressed Jack informed his parents that the Interrogators were telling him that "I have to let them search my truck," and that Crawford had ordered a search.

46. Thomas and Betsi reiterated that they did not consent to any search of the Subject Vehicle, and advised Jack to withhold consent as well. They advised Jack to try and film any search of the Subject Vehicle.

47. After directing Jack to terminate the phone call with his parents, Deturris addressed the other Interrogators, saying: "This is a school issue, not a police issue."

48. Although Deturris obviously made this statement to suggest that reasonable suspicion, rather than probable cause, was the threshold to justify the impending Illegal Search, this was immaterial, as the Interrogators lacked even reasonable suspicion.

49. During the Interrogation, Jack verbally and *repeatedly* indicated—explicitly and emphatically—that he *did not* consent to a search of the Subject Vehicle.

50. During the Interrogation, Jack verbally and repeatedly indicated that there was no firearm in the Subject Vehicle.

51. Jack believed that the only way to end the Interrogation was for the Interrogators to search the Subject Vehicle.

52. Jack's phone call to his parents asking for advice, telling them that the Interrogators "wouldn't leave [him] alone," and telling them that the Interrogators repeatedly recited that they

9

"had" to search the Subject Vehicle, confirm that any statement which could be construed as consent was not being "freely" made.

53. Notwithstanding the lack of consent by *any* of the Harringtons and their repeated statements that they *did not* consent to any search, the Interrogators, acting on Crawford's instructions, led Jack out to the HDHS parking lot against his will and demanded that he allow them to open the Vehicle for the Illegal Search. Yet again, Jack explicitly stated that he *did not* consent to the Illegal Search.

54. After a lengthy, high-stress Interrogation conducted by multiple administrators and a school resource officer, in which Jack repeatedly refused to consent to a search, it became clear to Jack that the Interrogators were, as Deturris confirmed, going to search the Subject Vehicle "no matter what" he did. While still in O'Rourke's office, Jack stated "so you're going to search it anyway." The Interrogators took this statement as consent to their unsupported search and led Jack out to the school parking lot, where they forced the door to the Subject Vehicle to open.

55. While in the parking lot, still surrounded by the Interrogators, Jack, with the keys in his pocket, silently watched McGinn force the Subject Vehicle's locked doors open and search through his belongings, *finding no firearm*.

56. McGinn, assisted by O'Rourke and Deturris, thoroughly investigated every area of the Subject Vehicle, confirming the truth of Jack's repeated statements that *he had not brought a firearm to school*.

57. To the extent that the Interrogators claimed after the Illegal Search that any of Jack's statements could be understood as consenting to the Illegal Search, those statements were coerced and clearly did not convey consent to any search.

58. Shortly after the completion of the Illegal Search, Thomas arrived on the scene in

a separate vehicle to find Jack and the Interrogators walking towards the school building, away from the Subject Vehicle. After Jack informed Thomas that "they already searched my truck," Thomas turned to address O'Rourke, who had accompanied Jack to address Thomas. O'Rourke immediately began to defend his untenable legal position, opining that "we did nothing illegal; we have a statement that Jack keeps a gun in his glovebox."

59. The Interrogation and Illegal Search accomplished the exact opposite of the School's objectives relating to searches of students: instead of working to "minimize disruption to school operations or ensure student safety," they created a spectacle with the Interrogation and the Illegal Search. Far more importantly, Defendants violated Jack's rights, protected by the U.S. Constitution, by undertaking the Interrogation and the Illegal Search.

### III. Aftermath of the Interrogation and the Illegal Search

60. By letter dated April 25, 2025, Thomas notified Crawford, O'Rourke, and McGinn of Jack's actionable claims arising from the Illegal Search. He wrote, *inter alia*: "You executed an illegal, egregious pursuit of Jack, aiming to ensnare him in trouble and jeopardize his future. You removed him from class, interrogated him like a criminal, and relentlessly pressured him to consent to a search of his private truck. When he refused repeatedly—supported by my wife Betsi, and me, who loudly instructed him over the phone, in earshot of all, not to consent—you, Brian McGinn, proceeded to violate his truck in the mere minutes it took me to drive two miles to the school. Your search found nothing, exposing your incompetence and vindicating Jack."

61. Defendants did not accept responsibility for their actions; instead, Crawford doubled down on their course of brazen misconduct.

62. Crawford, potentially aware of the constitutional liability that attached to the Illegal Search, attempted to recharacterize the Illegal Search as a "view" rather than a search.

63. By letter to Thomas dated May 13, 2025, Crawford concluded: "Based upon my review of the facts in this matter, I have concluded that there was not a 'search' of the car your son brought to school. Therefore, I believe the administrators acted appropriately to confirm that there was not a firearm on school property. Possession of a firearm on school property is contrary to school policies and federal law." In support of her conclusion, Crawford claimed that Harrington had allowed McGinn to "view" the contents of the Subject Vehicle's glove box and that Jack had consented to this "view." She further claimed that the "view" was acceptable since Deturris was present throughout the process.

64. Crawford's attempt to redefine the meaning of the term "search" as "view" only dug Defendants' legal hole deeper, and it was obvious that the Interrogators had conducted a "search" based on any plain English definition of the word as well as applicable Supreme Court Fourth Amendment jurisprudence. Demanding that a student allow school employees to open a vehicle after a lengthy interrogation, then physically opening a glove box, is undeniably a "search" within the meaning of the Fourth Amendment.

65. At all times discussed herein, Defendants were acting under color of state law, exerting their authority as officials or agents of Hillsboro-Deering Cooperative School District and School Administrative Unit #34.

66. Defendants' aforesaid conduct violated Plaintiff's clearly established rights under the Fourth Amendment.

67. Because of being subjected to the wrongful Illegal Search and the Interrogation, Plaintiff has suffered harm that cannot be adequately addressed absent declaratory relief.

68. Further, Plaintiff has suffered at minimum nominal damages, including at least those attributable to the violation of his constitutional rights, the value of Jack's lost classroom

instruction, the damage to his reputation caused by the accusation that he would illegally bring a firearm onto school property, and the costs and attorneys' fees incurred in bringing this action.

69. In sum, "[s]chools cannot expect their students to learn the lessons of good citizenship when the school authorities themselves disregard the fundamental principles underpinning our constitutional freedoms." *United States v. Montoya De Hernandez*, 473 U.S. 531, 561 n.31, (1985) (citing *Doe v. Renfrow*, 451 U.S. 1022, 1027-1028 (1981) (dissenting from denial of certiorari)). Defendants' conduct described above constitutes a flagrant violation of Plaintiff's rights, and so Plaintiff has been forced to bring this action to vindicate those rights.

## CLAIM FOR RELIEF

### COUNT ONE
### Violation of the United States Constitution
### Fourth & Fourteenth Amendments
### (42 U.S.C. § 1983)
### Illegal/Unreasonable Search
### (Plaintiff v. All Defendants)

70. Plaintiff repeats, realleges, and incorporates by reference each and every allegation of the foregoing paragraphs as if fully set forth in this claim for relief.

71. Plaintiff brings his claim pursuant to 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

72. The Fourth Amendment to the U.S. Constitution, incorporated through the Due Process Clause of the Fourteenth Amendment, provides in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures, shall not be violated . . . .

13

U.S. CONST. amend. IV.

73. "Ordinarily, a search—even one that may be permissibly carried out without a warrant—must be based on 'probable cause' to believe that a violation of the law has occurred. *N.J. v. T.L.O.*, 469 U.S. 325, 340 (1985).

74. The lower "reasonable suspicion" or "reasonableness, under all circumstances" standard is generally applicable to school searches. *T.L.O.*, 469 U.S. at 341.

75. Either way, the "fundamental command of the Fourth Amendment is that searches and seizures be reasonable . . . ." *Id*. at 340.

76. The legality of the search of a student depends on two factors: (1) "whether the . . . action was justified at its inception" (*Id*. at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1967)), and (2) "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*.

77. The totality of the circumstances surrounding the Interrogation and the Illegal Search confirms that Jack did not provide any valid consent to the Illegal Search. Jack was a student attending high school who was so coercively subjected to Defendants' influence that he called his parents for advice.

78. What's more, the Interrogators' statements made clear to Jack that he did not have the right to refuse consent. Their conduct confirmed that Jack's attempts to refuse consent and his parents' confirmation of this refusal had no bearing on their actions—the Interrogators were going to search the Subject Vehicle.

79. The Supreme Court has held that factors relevant to determining whether consent was valid include "age, education, experience, intelligence, and knowledge of the right to withhold consent" and "whether the consenting party was advised of his rights and whether consent was

obtained under 'inherently coercive circumstances.'" *United States v. Dunbar*, 553 F.3d 48, 57 (1st Cir. 2009) (quoting *United States v. Forbes*, 181 F.3d 1, 5 (1st Cir. 1999)); *see also United States v. Smith*, 919 F.3d 1 (1st Cir. 2019) (determination of whether consent to search was voluntarily given turns on assessment of totality of the circumstances).

80. Here, Jack and his parents made *many* repeated refusals of the Interrogators' requests for consent. Whatever "consent" Defendants may claim to have received was procured from Jack only after many minutes of questioning by school officials who ignored his repeated requests to leave O'Rourke's office and continued to insist that a search *was* happening, with or without his permission. To the extent Jack's deeply sarcastic confirmation that the Interrogators were going to disregard the law could be interpreted as "consent," such consent was far from freely and voluntarily given. Accordingly, the Interrogators did not have proper consent to search the Subject Vehicle.

81. Moreover, Defendants had no evidence or indicia that (a) Jack had ever brought his handgun to the HDHS campus, (b) Jack intended to bring his handgun to the HDHS campus, (c) Jack intended to use his handgun in anything other than a lawful manner, or (d) that the interaction with the police officer occurred on the school campus or anywhere near the campus (it did not).

82. Indeed there was no evidence or indicia of any of the above conduct – or that Jack had committed *any* crime—because Jack was and continues to be a lawful firearms owner who emphasizes safe, responsible storage and use of firearms. He had never brought a firearm to school, and certainly had no intention of ever doing so. Indeed, when Jack wasn't carrying his handgun, he kept it safely stored at the Harringtons' home.

83. The Interrogators conducted the Illegal Search in reliance on generalized information relating exclusively to an event that took place in the past, unaffiliated with school

activities or school grounds.

84. Simply put, the Interrogators presented Jack with evidence that he had *followed* the law in exercising his constitutional rights, and then used that evidence to suggest that he might break it; however, it is axiomatic that evidence of following the law and exercising one's rights cannot be used to justify a search.

85. Here, whether analyzed under the probable cause standard or reasonableness standard, the result must be the same: the Illegal Search, and the Interrogation that preceded it, were both unreasonable and unconstitutional. No search was justified at the inception of the Interrogation, no search was justified because of the Interrogation, and the actual Illegal Search that was conducted was not reasonably related in scope to any circumstances justifying either the Interrogation or the Illegal Search.

86. At the time of the Interrogation, there was no reasonable basis to believe that Jack had a firearm on the HDHS campus. Crawford and her subordinates had heard only a secondhand account of the Bus Conversation, in which Jack had described an incident in which he was stopped while driving and his lawfully owned firearm was in the glove box of the vehicle. Critically, the incident had taken place weeks before the date of the Interrogation and the Illegal Search, Jack was not driving to or from school or any school-sponsored event at the time of the stop, and he was not on school property. Defendants had no information whatsoever that would have given rise to a reasonable suspicion that Jack was storing a firearm in the Subject Vehicle while on-campus, or more particularly, that Jack was storing a firearm in the Subject Vehicle on April 24, 2025. Nor could they—Jack never told anyone that he ever brought his firearm on-campus or that he intended to bring his firearm on-campus. Moreover, Jack never made any threats relating to firearms or otherwise.

87. Consistent with the facts here, the New Hampshire Supreme Court has found that a "search" took place in circumstances where assistant principals informed a student that they were going to be searched and then commanded them to reveal the contents of their bag. *In re Anthony F.*, 163 N.H. 163 (2012).

88. Moreover, in the context of other fundamental rights under the U.S. Constitution, the Supreme Court has held that "when it comes to [conduct] that occurs outside a school or a school program or activity, the school will have a heavy burden to justify intervention." *Mahanoy Area Sch. Dist. V. B.L.*, 594 U.S. 180, 190 (2021) (finding that a school violated a student's rights by punishing her based on events that took place off-campus, outside of school hours).

89. The Illegal Search violated Plaintiff's right to be free from unreasonable searches. under the Fourth Amendment.

90. Intentionally and acting under color of state law, Defendants deprived Plaintiff of his Fourth Amendment rights.

91. Accordingly, Plaintiff is entitled to a declaration that Defendants' Interrogation and Illegal Search were unconstitutional.

92. In addition to declaratory relief, Plaintiff is entitled to, at minimum, nominal damages for Defendants' violation of his clearly established rights under the Fourth Amendment.

93. As well, Plaintiff is entitled to his attorneys' fees and costs associated with this action.

## JURY DEMAND

94. Plaintiff hereby demands trial by jury by the maximum number of jurors.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's

favor and against the Defendants as follows:

(a) On Count One, declaratory judgment that the Interrogation and the Illegal Search were unconstitutional;

(b) On Count One, at minimum, nominal damages;

(c) On Count One, Plaintiff's attorneys' fees and costs associated with this action pursuant to 42 U.S.C. § 1988; together with an award of pre-judgment and post-judgment interest at the highest lawful rates, and

(d) Any other and further relief as the Court deems just and proper.

Dated: October 15, 2025

Respectfully submitted,

Jack Harrington, by his attorneys,

*/s/Matthew R. St. Hilaire*
Richard J. Lehmann (Bar No. 9339)
Matthew R. St. Hilaire (Bar No. 278826)
**Lehmann Major List, PLLC**
6 Garvins Falls Road
Concord, N.H. 03301
rick@nhlawyer.com
(603) 715-2516

*/s/Edward Andrew Paltzik*
Edward Andrew Paltzik, Esq.
Meredith Lloyd, Esq.
**Taylor Dykema PLLC**
914 E. 25th Street
Houston, TX 77009
Tel: 516-526-0341
edward@taylordykema.com
(*pro hac vice* admission forthcoming)

*Attorneys for Plaintiff Jack Harrington*

18