# EXHIBIT E

*COPY*

JACK HARRINGTON

V.

JENNIFER CRAWFORD

Docket No. 1:25-CV-407

BETSIANNE HARRINGTON

March 25, 2026



AVICORE REPORTING

15 Constitution Drive, Suite 1A · Bedford, NH 03110 · (603) 666-4100
info@avicorereporting.com · www.avicorereporting.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

JACK HARRINGTON,

Plaintiff,

**COPY**

V.

JENNIFER CRAWFORD, AS SUPERINTENDENT OF
HILLSBORO-DEERING COOPERATIVE SCHOOL DISTRICT AND
SCHOOL ADMINISTRATIVE UNIT #34, JAMES O'ROURKE, AS
PRINCIPAL OF HILLSBORO-DEERING HIGH SCHOOL, BRIAN
MCGINN, AS VICE PRINCIPAL OF HILLSBORO-DEERING HIGH
SCHOOL, AND MICHAEL DETURRIS, AS SCHOOL RESOURCE
OFFICER OF HILLSBORO POLICE DEPARTMENT

Defendants.

Civil Action No. 1:25-CV-407

DEPOSITION OF BETSIANNE SUZOR HARRINGTON
taken at Concord, New Hampshire,
on March 25, 2026, at 12:30 p.m.

Court Reporter:

Cynthia Foster, RPR

LCR #14 (RSA 310-A-161-181)

2

APPEARANCES:

On behalf of the Plaintiff, Jack Harrington:
TAYLOR DYKEMA PLLC
By: Edward A. Paltzik, Esq., by Teams
914 E. 25th Street
Houston, TX  77009
516-526-0341
edward@taylordykema.com

LEHMANN MAJOR LIST, PLLC
By: Matthew St. Hilaire, Esq.
6 Garvins Falls Road
Concord, NH  03301
603-715-2516
matt@nhlawyer.com

On behalf of the Defendant, Jennifer Crawford,
as Superintendent of Hillsboro-Deering
Cooperative School District and School
Administrative Unit #34, et al:
FRIEDMAN FEENEY GETMAN, PLLC
By: Christine Friedman, Esquire
95 N. State Street, Suite 5
Concord, NH, 03301
603-688-9994
Chris@friedmanfeeney.com

3

INDEX

Deposition of Betsianne Suzor Harrington

Examination by Ms. Friedman:                    5

Examination by Mr. Paltzik:                    59

EXHIBITS

None.

4

S T I P U L A T I O N S

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under New Hampshire practice.

Notice, filing, caption and all other formalities are waived.  All objections except as to form are reserved and may be taken in court at trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

It is further agreed that exhibits may be retained by counsel until the time of trial.

BETSIANNE SUZOR HARRINGTON,

DULY SWORN BY ATTY. FRIEDMAN

EXAMINATION

BY MS. FRIEDMAN:

Q    Can you state your name for the record?

A    Betsianne Suzor Harrington.

Q    Suzor?

A    S U Z O R.

Q    Thank you.  I think that we briefly introduced ourselves when you first arrived, but I just want to make sure that you understand my name is Chris Friedman.  I'm the attorney who represents the Defendants here, and we're here today just for you to answer some questions I have about the matter.  Okay?

A    Okay.

Q    I don't think this is going to take terribly long, but it takes as long as it takes.  It's not an endurance test to see how long you can sit still.  So if for any reason you need a break, the only thing I ask is that you answer whatever the pending question is and you can take that break.  Okay?

A    Okay.

Q    There are a couple of basic grounds rules that I just want to make sure that you understand before we go forward which will make this a lot easier.

In a lot of ways it's going to feel like an ordinary conversation, but one of the big differences is that we have a court reporter taking down everything that we say, and that does impose some constraints on us.  So she's taking down verbal responses which means you need to give verbal answers.

A    I understand.

Q    Nods and shakes of the head, uh-huhs and uh-uhs, they're a part of how we communicate as humans.  They just don't work well in this format, okay?

A    Yes.

Q    We do this every day so we'll remind you, but it's just helpful if you can keep it in mind, all right?

A    Yes.

Q    All right.  I forgot what the other rule is, but the most important rule as far as I'm concerned

is that we've understood each other today.  So if for any reason you give me an answer that I don't understand I'm going to ask you to restate the answer.

A   Okay.

Q   But I want to make sure that the other side of that coin is true.  So for any reason I ask you a question that you don't understand, would you please ask me to restate the question?

A   Sure.

Q   I'm going to assume if you answered my question you understood it, fair?

A   Yes.

Q   Okay.  Can you please give me your date of birth?

A   8/14/70.

Q   And you're married to Thomas?

A   Yes.

Q   For how long have you been married?

A   20 years.

Q   Do you currently work outside of the home?

A   I have an antique shop at my house.

Q   Okay.  What's it called?

A    Clement View Antiques.

Q    How long have you been doing that?

A    I retired from the Department of Corrections about 7 years ago, I would say.  Maybe 6 or 7 years ago, and it started with something small like a tent and then it turned into a legit antique shop in my barn.

Q    When you said you retired from the Department of Corrections, was that state or county?

A    State, the prison right up the street here.

Q    The prison in Concord?

A    In Concord, yes.

Q    What did you do there?

A    For four or five years I was a sex offender counselor, and then I became the unit manager of the North End House which is a halfway house which is on the Concord grounds.

Q    Okay.  Have you ever been involved in a lawsuit before?

A    Where someone sued me?

Q    Or you did the suing.

A    Had an accident by Exit 13 and somebody hit me when I was stopped at a light.

Q   Here in Concord?

A   Yes, and that person had no insurance.  State employee but had no insurance.  Me and the kids were in the car, and I did go to the hospital, I believe.  I think it ended up paying out like $5,000 in the end.  So it was a typical car accident type thing, I think.  And I didn't sue anybody.  It was the insurance.

But we did make a claim on, you know, my having gone to the hospital and having gone through a little bit of whatever I went through.

Q   Sure.

A   But that's it.  No like lawsuit for other things.  When I was 16, I was just telling him about suing to be able to play ice hockey.  It was a --

Q   Like a Title IX action?

A   In Massachusetts they had made a new rule that said there would be no coed sports because boys were playing on the girls' field hockey team, and I was playing ice hockey at the time.  And so when they made that new law I couldn't play ice hockey anymore, and I had already made the

10

varsity team.

So I sued the state of Massachusetts with whoever had offered, like an attorney that offers to cover it for free because it's a discrimination suit. I think it was the Massachusetts Commission Against Discrimination. I think that's who covered it, and they represented me, and I went to one hearing and they changed the rules so I could play. So I played for the rest of my time, and it wasn't like a huge big deal, but I did have that experience when I was 16.

Q    Any other lawsuits regardless of which side you were on?

A    Let me just think. So I had the car accident. I got paid out for that. That's why I remember that. And the thing when I was kid. I don't think so. I don't believe that I remember anything.

Q    I understand that you have two children?

A    Yes.

Q    Noah and Jack?

A    Yes.

Q    Is Noah still in high school?

A    Yes.

Q    Is he a senior this year?

A    Yes.

Q    I just couldn't remember.  All right.  Prior to April 24th, 2025, the date of the search of Jack's glove box, had Jack ever had any disciplinary problems at the high school while he was at the Hillsboro-Deering High School?

A    So yes.  The Vice Principal had accused him of doing something that he didn't do.  We reviewed the recording, and she called me and apologized for making it up and lying and accusing him of things he didn't do, and in the end the Superintendent and this Vice Principal had called us both to apologize for her part that she had made, like she had said, I was very upset and so I'm sorry that I said those things. I thought that's what happened, but it wasn't. Exactly what Jack said is what happened.

        And he was kissing his girlfriend as they were walking out the door, and it was like a (descriptive noise), goodbye, she was getting on

12

the bus, and she accused him of much more than that, and when it was reviewed, that's exactly what was seen and apologies came around and that woman doesn't work there anymore.

Q    There's a lot of blanks at least in my head that I want to try to fill in about this story.

So Jack, apparently the impetus for this discipline was that Jack was seen kissing his girlfriend walking out the door.  Right?

A    She said much more.

Q    Who's the "she" in this sentence?

A    The Vice Principal.

Q    Whose name is?

A    Joy Clancy, I think.  I'm not sure that's her first name, but Clancy is the last name.

Q    At the high school.

A    Yes.  She's not there anymore so I don't really know her that well.  It was just really just that one incident.

Q    What is it that the Vice Principal, who may or may not be Joy Clancy, what did she say happened?

A    She said that they'd stopped, were making out

13

with tongue, and that he had said things back to her that were rude, and I don't know because he didn't do it.  Right?  So she claimed he had said things and like talked back to her and he said no, Ma, this is exactly what happened.

This was mask time and Jack didn't wear a mask.  He had a doctor's note.  And the girl friend did.  She had pulled her mask down.  They had done the (descriptive noise) and she went out to the bus.  That's how long it was.  The Vice Principal had claimed they were making out with tongue and all that.

So when I heard the story I went to the Superintendent and said someone needs to watch that video just to say what really happened. Someone's lying here, and how are we going to figure out who is it unless you watch, it was right at the exit.

Within an hour I get a call from her and the Vice Principal apologizing saying that that's what she thought happened.  She's so sorry.  But Jack had been suspended by her for that moment, and then it was all withdrawn.  So

14

he wasn't really in any trouble, but for a while he was.

Q    And the Superintendent that you called to ask that the video be watched, who was that?

A    She's not there anymore either.  Whoever the last one was.  I can't remember her name.

Q    Okay.  But it was before Superintendent Crawford became the superintendent?

A    Yes.  Different.

Q    So I'm going to restate what I think you've said, and please tell me if I'm got everything right.  Not trying to put words in your mouth. Just trying to making sure I've understood.

Jack was kissing his girlfriend on the way out the door.  The Vice Principal misconstrued that, and said that Jack was engaging in a makeout session with his girlfriend and when confronted he was inappropriate and rude to the Vice Principal, correct?

A    Yes.

Q    So Jack was suspended by the Vice Principal because of that.

A    Yes.

15

Q   Because of her take on what had happened.

A   Yes.

Q   Once you found out that Jack had been suspended, and you spoke to Jack to find out what really happened, you called the superintendent and asked that person to review the video.

A   Yes.

Q   The review of the video showed that Jack had told the truth.

A   Yes.

Q   As a consequence the suspension was rescinded, correct?

A   Yes.

Q   And the Vice Principal was let go?

A   She left at the end of the year, but she did have to call us both to personally apologize and say that he did say exactly the truth as to what happened that day.

Q   And was the reason that Vice Principal Joy Clancy or whatever her name was, is the reason why she left at the end of the year because of this event?

A   I have no idea.

16

Q   So we got down this path because I asked you if Jack prior to April 24, 2025, had been the recipient of any discipline at the high school.

A   That's all I'm aware of.

Q   That was short-lived and --

A   For one day.  Yes.

Q   And a mistake.

A   And fixed.  Yes.

Q   Okay.

A   Now, he may have gotten into things that they didn't call me about, but they didn't call us. The school.

Q   Right.  I'm only asking what you know.

A   Yeah, yeah.

Q   You can't say what you don't know.

A   Certainly could he have been called down to the Principal's office and me not know?  Sure.  But do I know of anything?  They weren't calling me from the school to make any complaints.

Q   If Jack had been called to the Principal or Assistant Principal's office when he was in high school, would he have reported that to you?

A   Maybe.  You know.  I think he probably has been

17

to the Principal's office at least once.

Q    And in his deposition earlier today, he described a series of disagreements with the administration while he was in high school over his refusal to wear a mask at school.

A    That's certainly possible, but they weren't calling me to complain about it.  We got him a doctor's note, and that was the best we could do.

Q    Okay.  Jack turned 18 toward the beginning of his senior high school year?

A    November.

Q    Yes.  So toward the beginning.

A    Yes.

Q    When he turned 18 it's my understanding from his testimony that he became an owner of a gun, a handgun.  Is that right?

A    Yes.

Q    All right.  I take it you didn't have an issue with that?

A    No.  It was gifted to him.

Q    You thought he was mature enough to own a gun?

A    Yes.

Q    And mature enough to understand the rules about gun ownership?

A    Yes.

Q    His rights and responsibility as a gun owner?

A    Yes, and we took time to do that.

Q    That's what my next question is.  Did you and/or your husband take the time to explain to Jack what the rights and responsibilities of a gun owner are?

A    Yes.  Considerable time.

Q    And so this period of time from when he turns 18 until when he graduates that following spring from high school, would you consider Jack a mature 18 year old?

A    Very mature.  Yes.

Q    And how did that manifest in his everyday life?

A    So Jack was always working from a very young age.  He does a lot of the work at our house. We have a farm, a 55-acre farm and he does work that we don't ask for.  Like all the wood for the heating of the home, we never asked him ever once to cut wood.  That boy supplies the wood for that house completely.  We have a 3100-foot

house that we mostly heat with wood.  He is just a worker bee.  He works, you know, as soon as he graduated he goes to work and he works every day at 5 a.m. he leaves and no one has to tell him to do anything.  He's just the most independent person his age that I know.

Q    No disrespect to his younger brother.

A    His young brother has different strengths than he does.

Q    I'm only teasing.

A    But Jack was like third in his class.  Noah's number one in his class right now so they both have their strengths.

Q    You said something a minute ago I just wanted to circle back to.  You said a 55-acre farm that Jack does most of the work on.  Is this an animal farm?

A    No.  We've had chickens and other animals, but for the most part right now it's just an agriculture, considered an agriculture farm that we aren't farming on right now.  We have a foster dog right now, and that's a huge, like way bigger than I ever thought amount of work.

Q    A dog.

A    A foster dog right now.  We have a regular dog but the foster is not getting along with the other dog so he's just a handful so he's helping with that, too.

But right now his employer is on vacation so he's literally staying at his employer's house, taking care of his pets, all that.  He's managing, and they live down the road from us.  If he wants to come home and shower at home he can, but he's been staying at their house for the last week.

Q    So when you said Jack was doing the work around the 55-acre farm, it's not a working farm, I just would like some examples.

A    He heats the house, he plows, you know, he does all the cutting of the lawn.  He plows the driveway.  We have a large tractor so he is the one who knows how to run that tractor.  He can repair the tractor.  Repairs, he did his brother's brakes yesterday on his Honda.  So he just does all the things, without asking just does all the things that maybe the adult male in

21

the home would do.

You know, Tom works really hard in Keene. Not that close to home.  Always traveling.  So Jack really picks up any slack that Tom might not be able to handle.

Q    What does Tom do?

A    Tom's a salesman for HVAC.

Q    What company?

A    Bergeron Mechanical in Keene.

Q    So he's on the road a lot?

A    He's an in-home salesman so he's literally on the road all the time.  He has an office at home, but when he's at home we get quiet and let him work and don't interfere.

Q    Sure.  So at least for the time period from when Jack turns 18 until when he graduates from high school a handful of months later, it sounds like you viewed him as a very responsible, mature young man.

A    I would trust him with my house.  I would walk away and let him run it.

Q    Even as an 18 year old.

A    Yes.

22

Q    I know he's 19 now.

A    Even then I would have, yes.  And maybe not my other kid.  You know, he's more independent, I would say.  Even though he wasn't number one student in his class, he's an incredibly independent and responsible person who I would just trust.

Q    Were you aware of the fact that on April 11th of 2025, so about a year ago, Jack was pulled over for an overdue inspection sticker on his truck in Hillsboro?

A    Yes.

Q    What did you know about that incident?

A    He said something about it being about going, he was going to get car parts or something from a place that's like a mile from or couple miles from our house, and he said that it was, he had a gun in his glove compartment, that he told the officer, that he didn't get any tickets or in any trouble.  But that he was a little nervous, you know, because that was the first time he had ever been pulled over and had his gun on him. And he said it went fine.  So he mentioned it,

23

but it was pretty brief.

Q    Either you misspoke or I misheard so I want to go back and, Jack said that he was on his way to get some car parts when he got stopped.

A    Or after, it might have been after.  I don't know if it was before or after, but it was near the car part place, I guess.

Q    And Jack told you that at the time that he was stopped he was carrying his gun in his glove box.

A    Yes.

Q    All right.  And did he then tell you that he reported that to the officer that he had a gun in his possession?

A    When he had to get whatever paperwork out of that glove box.

Q    So if I understand the sequence of events, the police officer pulls Jack over, and Jack in the process of getting his license and registration and what have you out of the glove box, he informed the officer that there was a gun in there?

A    Yes.  That's my understanding.

24

Q    Is that what you and your husband had counseled Jack on how to handle himself if he got pulled over with a gun in the car?

A    Oh, always.  Report it immediately.  You know. When he started to say I'd like to leave the house with it, you know, because we would practice at home and talk about, you know, how you would handle a gun, and we would, we have 55 acres so we can shoot a gun on our own property with the whole setup, you know, what do you call it?  Target shooting.

Q    Um-hum.

A    So we've certainly talked during those target shooting practices about all kinds of gun safety including if you were to leave the home with it and that kind of stuff.  So yes, we talked about it, about what you would do, and how you would say it and always admitting.  You would never hide such a thing.  That kind of stuff.

Q    So prior to this day, August 11, 2025, had you and your husband specifically told Jack that if he gets pulled over by law enforcement while he has the gun in the glove box he should report

25

that to law enforcement?

A    We would never have said it that way, but we would certainly have always told him to always admit that you would have one if you ever get asked.

Q    Admitting is different.

A    He would never hide it.

Q    Admitting is different so I want to make sure we're on same page.  Prior to April 11, 2025, did you counsel Jack to volunteer to law enforcement if he'd been pulled over with a gun in his truck to tell them that he had a gun on his person or in his truck?

A    I don't know if I, we certainly gave him lots of instruction on guns and if you were to be pulled over you would always be honest.  You would never hide it.

MR. PALTZIK:  The entire line of questioning about being instructed to notify law enforcement, objection to relevance.  You can answer.

Q    Okay.  Have you told me everything you can remember that Jack reported to you about the

traffic stop of April 11?

A    It was quick.  That's what I remember.  Him just saying this happened.  It went fine.  He didn't get in any trouble, but I had to tell them when I went to get my paperwork that it was there.

Q    Okay.  In relation to when the traffic stop occurred, when did Jack tell you about it?

A    I don't know if it was that day or not because it was near the date, but I don't know exactly what date.

Q    Do you know if he was alone in the truck?

A    I believed he was.

Q    Have you told me everything that you can remember that Jack told you about this traffic stop?

A    Yes.  It was pretty minimal.

Q    Did you have anything to say in response when Jack told you this about the traffic stop?

A    I think I was just making sure he was doing the right things.  You know, I worked in law enforcement myself for a long time so I would certainly want to just make sure he was handling it as appropriate as possible.

Q    Have you worked in law enforcement in addition to your time at the DOC?

A    So before I worked at the Department of Corrections I worked for like a court program that was called JJIE, and I think it stands for Juvenile Justice Intermediate Evaluation.  I think that's what that stood for.  I was a social worker, the therapist on occasion in a group that we took children who were court involved and did assessments on them and their families to decide where the problem was. Whether it was the kid, what needs they had, whether it was parents, whether they needed something, and it was basically like a wraparound-type intervention to evaluate children that were court involved.

So I don't know if you'd call that law enforcement, but I've worked with courts, I've worked in, you know, foster care and adoption for a long time, and then with court-involved people.

Q    So prior to April 24th, the day of the discussion in the Assistant Principal's office

28

and search of the glove box, had Jack been involved in any other interactions with law enforcement where he had a gun on him or in his vehicle?

A    Not that he told me.

Q    To your knowledge did Jack ever --

A    Actually --

Q    Go ahead.

A    Yes.  The other day.  I don't know.  Maybe yesterday or the day before Jack got pulled over.

Q    If I didn't make this clear previously, let me do so now.  I'm talking about prior to April 24.

A    No.  Yeah.

Q    So let me just go back and clean it up.  Prior to April 24 of 2025, had Jack ever been pulled over or had any other interaction with law enforcement where he had a gun on his person or in his vehicle apart from the April 11 traffic stop?

A    Not prior.  Thank you.  Sorry.

Q    That's quite all right.  So the traffic stop is April 11.  Are you aware of the incident that

occurred within a week of that at the Osram plant?

A    Yes.

Q    How did you become aware of it?

A    The kids came home and woke us up or actually came to me -- no, woke us up.  Tom and I were sleeping.  And basically said you need to get up, you know, something just happened to us, and, you know, what should we do, and I basically just said go to the police station and tell them what happened.  Like be a good citizen and do, you know, go tell them what happened. So that's what they did, and I didn't even go with them.  I wasn't feeling well at the time. I regret it, but I wasn't feeling well so I did not go with them.  I honestly just thought they were going to go and give their statements as victims.

Q    Prior to the boys leaving for the police station, did Jack tell you that he had been involved in a physical altercation with an Osram employee?

A    He told me that somebody had hit him.

Q    Did Jack tell you that he hit back?

A    Yes.  That he, he told, that he had, that Anthony had gotten pushed, then the guy put his hands on him.  In the midst of this guy having his hands on him, he tried to fight back to get him off of him because he was holding onto him.

Q    Okay.

A    So he said while he was holding on to me I was hitting him to try to get him to stop.

Q    Okay.  So he did tell you --

A    I've seen the video, too.

Q    He did tell you that he'd been involved in a physical altercation with an Osram employee.

A    Yes.

Q    Your husband was also present at the house?

A    Yes.  I think he was in bed.  I don't think he was awake when I sent the kids to go to the police station on their own.

Q    Prior to that day, whatever day it was of the Osram incident, do you happen to remember the date?

A    The Osram day?

Q    Yes.

A    No.

Q    I can look it up but let's just go with --

A    We know of it.

Q    -- whatever the date was.  So prior to that date, had your children ever gone to the police station for any reason in Hillsboro?

A    No.

Q    Prior to that date, had your children been to any police station for any reason?

A    No.

Q    So the boys come home, in the evening, and tell you, wake you up and tell you that this incident had happened at the Osram plant, and your response was to tell them to go to the police station?

A    And write victim statements.

Q    And tell the police what happened.

A    Yes.

Q    And because you've already expressed the thought that you thought Jack was mature and responsible at that point you felt comfortable sending both kids to the police station at night by themselves?

A    Yes.  It was maybe 9:30, 10 o'clock at night.
It wasn't super late, but it wasn't early
either.

Q    And is there any reason, you told me that you
weren't feeling well.  What was wrong?

A    So I have, one of the reasons I don't work
anymore is because I just have a gut issue that
makes it so I sometimes need to be near the
bathroom or I feel nauseous a lot so that I was
just not feeling well at the time and I was like
I am not up to going with you right now.  I
don't think I can do this.  So I figured -- Jack
was like no, mom, I've got this.  You know.  We
didn't start this, this was like we're going to
do our best and so I said okay, go tell the
truth.

Q    Is there any reason why Thomas could not have
gone to the police station with the boys if you
felt that was an important thing?

A    He wasn't awake, and I didn't want to wake him.

Q    Both you and Jack felt comfortable sending Jack
and Noah to the police station?

A    To write a victim statement, yes.

Q    How long were they gone, do you know?

A    Maybe an hour.

Q    Did you wait up?

A    I did.

Q    Did they tell you what happened when they got back?

A    I think Jack said he wrote a statement and Noah wrote more I think is what he said.  He said Noah wrote too much or a lot or, you know, more than I did, and I don't think it was necessary. I wrote what happened really succinctly, and he wrote more.  Basically what he said.

Q    Did either Jack or Noah tell you that they were questioned by an officer in an interview room?

A    They didn't say anything like that.  They basically just said they wrote statements.

Q    Do you know now that that happened?

A    I don't know if that happened.  If they got questioned at all.

Q    Have you ever seen the police report?

A    I've requested the police report over and over and over again and never gotten it.

Q    Are you aware of the fact that at some point in

this same period of time, between April 11 and April 24, so talking about a two-week time period, we know the traffic stop happened in that two-week time period.  We know the Osram incident happened in that two-week period.

Are you also aware of the fact that within that same two-week time period Jack had a conversation with a fellow member of the baseball team on the school bus on the way to or from an away game about the traffic stop and the fact that he had a gun in his truck at the time?

A    I'm aware that there was a conversation.  Yes.

Q    How are you aware of that bus conversation?

A    So Jack called when he got pulled out of school to be searched for a gun, and he called me to say that they want to search the car for a gun.  It's actually my car and not even his car, but he calls it his car.

So he says they want to search my car for a gun, and I said why.  You know, and he explained to me on the phone right there real quickly and I said so there's no gun and he said no.  So I said then say no and don't comply.

35

And he says I don't have a choice.  They're not giving me a choice.  There's nothing I can do, and I said well, then just say no, and if they force you, they force you, but just say no.

Q   All that may be true, but I was asking about the bus conversation and just how you became aware of it.

A   So he calling me from the school in hysterics saying they're searching me for a gun right now is when he started to tell me that story.

Q   So in that moment did he explain to you what the content of the bus conversation was?

A   Yes.

Q   What did he tell you?

A   That he talked to Ben, I think it was Ben or there's two kids it could have been, but I think his name is Ben.

Q   Last name?

A   Who is a captain of the team.  I'm not sure, I think it was Ben Perrin who was one of the other captains, and basically just saying yeah, I had a nervous moment when I got pulled over.  I had to tell them when I went to get my paperwork

that I had a gun in my glove compartment but that it went fine.  I didn't get a ticket for anything, and it was a, you know, life experience.

Q    Why was he nervous about the fact that he had a legal gun in his truck which he had a permit for?

A    I think every human being would be nervous under that circumstance.

MR. PALTZIK:  Just note my objection to the form of the question.

Q    Okay.  So when Jack is relaying the content of the bus conversation to you from the Assistant Principal's office on April 24th --

A    I don't know where he was when he called.  He was at school.  I understood that.

Q    Did you understand that he was in an office with administration?

A    I understood that, yeah, people were around him.

Q    Okay.  So regardless of whose office it was, during the time that Jack was speaking with administrators about possessing a gun, whether he possessed a gun or not at school, Jack

relayed to you the bus conversation in which he said that he was talking to Ben Perrin on the bus, and he had a nervous moment recently when he had to tell an officer that he had a gun at a time when he got stopped.

A    Yes.

Q    Is that essentially true?

A    Yes.

Q    Did he tell you anything else about the bus conversation then or ever?

A    He tried to explain it as much as he could probably repeatedly to me over the, you know, next few months.

Q    That may be, but that doesn't answer my question.

Did he provide you any other details at any point about the bus conversation that you can remember as you sit here today?

A    I think he just told the truth.  I don't think there's anything to add.

Q    I'm not questioning whether he told the truth or not.  My question is whether he told you any other facts about the bus conversation, and if

38

so, what were they.

A    So he said that he was talking to Ben or I think it's Ben or the other captain, and saying you know, I got pulled over.  I was a little nervous when I had to say I had a gun.  Everything was fine, and that was about it.  He didn't too much go into that.  I don't think that the conversation was very long with Ben.

Q    I'm not concerned about the length of the conversation.  I just want to know if you can remember anything else that he ever told you about the bus conversation.

A    I don't think I'm leaving anything out, but I don't know.

Q    Okay.  Did you ever speak to Ben about the bus conversation?

A    No, but I'm friends with Ben's mom, and I didn't speak with her about it.

Q    Did you ever speak to anybody about the bus conversation other than people in your household?

A    Maybe my friend who's actually Jack's boss now. I might have talked to her about it.  Just we're

friends but nobody, not like the school.  Not the police.  Nobody else.  Just a friend.

Q   Okay.  So the next point in time during this two-week period that I'm concerned about or that I want to ask you about is April 24th, 2025, the day that Jack is asked to come to the Assistant Principal's office.  Okay?  I just want to orient you to time and place.

A   Yes.

Q   Okay.  Were you present when Jack called, either you or your husband?

A   He called me first.

Q   Did he reach you?

A   He reached me.  He tried to call his dad first, and his dad didn't answer, but his dad was with me.

Q   Where?

A   At home.  Well, his dad was in another room and I was in the kitchen, and I answered the phone in the kitchen and eventually walked up to my husband and said you need to be part of this conversation.

Q   So Jack called your cell phone, you and your

40

husband were home, he was in a separate room but you immediately got him, your husband, so that the two of you could speak to Jack together?

A    Yes.  Jack first told me though that first little bit where you said what did he tell you, and he said I was telling Ben about what happened the other day or two weeks ago and they're now saying that that gives them a right.

Q    Okay.  That conversation about the bus conversation occurred before your husband joined you.

A    Yes.  He was, he could have heard.  He was in a room where the doors were, where it's wide open so he's like doing his work over there maybe busy, maybe not listening, right?  And I'm in the kitchen which is just one room away with an opening, not a door but a full-on opening.

So he could have heard the whole thing, but I don't know that he was paying attention until I said hey, hon, this is like an important thing and you need to be part of this.

Q    Yes.

A    And I put it on speaker.  So initially I was

talking to Jack and hearing what he had to say, and I didn't engage Tom until maybe two minutes in.

Q   All right.  Then once Tom joined the conversation --

A   I put it on speaker phone.

Q   Speaker phone, and then what I'd like to know is everything that was said by anyone who participated in the conversation.

A   It was only Jack because Jack called me.  The school never called me.  Well, I talked to the school later, but at that point the school had not called me.  And Jack had just called to say hey, you know, they're trying to search my truck.  What should I do?

And I was like something of like well, what happened, you know, where is your gun.  Why would they say that?  And he's like I would never bring it to school.  I've never ever brought it to school.  It wouldn't be here.  He said it's not here.  I don't know why they're insisting, it's because I've had one.

And I just said well, then say no.  Then

42

say no.  If it's not there, and you have no valid reason, I said, did you do something or is there something I'm missing?  You know, because I kept thinking like they must have some reason.  And he was like no, it's just that I said that I got stopped.  I was like well, then say no.  And his dad got on the phone and said unless there's some law that says they can search you against your will just say no and record it.

And so he said no, I said no, and I was of the impression that the people in the room could hear me saying that, but I don't know whether they did hear me say it or not.

Q    Did you know who was in the room?

A    No.  Jack said later about who questioned him.

Q    Right.  In the moment I want to know what you knew --

A    I didn't know in the moment.  No.

Q    So before you said the words "I was under the impression that the people could hear me," before that you were relaying the content of the discussion.  Have you told me everything that you can recall either you, Jack or your husband

said?

A    Let me just go through it again in my head if that's okay.  So he calls.  I asked, he says they're wanting to search me for a gun, and I'm like what gun.  There is no gun.  There's no gun here, Mom.  I'm like okay.  Well, why do they think so.  Well, because I had this conversation on the bus.  And I was like okay, I said, but you never said there was a gun in your car and he said no, there isn't one so obviously I didn't say that, Mom.  Okay.  Then just say no, and he said but they're basically not allowing me to say no.  They're saying they have no choice.

So I said okay.  Then say no and record it.  Like I don't know what else to tell you but just say no.  And so he was like "I'm under intense pressure" or something like that.  So I don't think he ever recorded it, but he just kept saying no.  Where I could hear.  You know.  He was like okay, no, I'm not doing it.  And his father got on and said the same thing, no, I'm not doing it, and I heard him saying no, like

I'm not doing it, I'm not doing it.

Q    So have you now told me everything that you can recall about the phone conversation?

A    Tom might have said more.  You know, like Tom and him talked a little bit and he basically said no.  I heard him say something to the effect of, you know, if there's some new law out there that I don't know about that they can search you against your will, he said, but record it if that's what they do.

So I just remembered the two of us saying no, and then Tom is just like I'm going to go down there.

Q    Did he say that while on the phone?

A    I don't think he said it while he was on the phone, but as soon as, you know, we were done he was like I'm just going to drive straight there.  It's two miles from our house, but by the time he got there they'd already done it.

Q    At any point while you were on the line with Jack, did you or your husband ask Jack to put one of the administrators on the phone?

A    Nobody asked, no.  They didn't ask to talk to

us, and we didn't ask to talk to them.  It might have helped because the gun was at home.

Q    And your recollection is that it was Thomas who told Jack to record any attempt by the school to search Jack's truck; is that right?

A    Yes.  The school has cameras of the parking lot. So I would imagine it would have been recorded already.

Q    Have you seen any footage?

A    We've requested the body cam footage from the police officer.

Q    Have you seen --

A    No.

Q    You were just talking about the school cameras. So have you seen any of the school camera footage?

A    No.  We've seen none of the camera footage, but we've made some requests.

Q    Do you know whether Officer DeTurris had a body-worn camera on the day of?

A    Our request was never met.

Q    That's not my question.  Do you actually know whether on April 24th of 2025 Officer DeTurris

had a body-worn camera on?

A    I don't know.  I know that the Hillsboro Police Department wear cameras.

Q    Right.  That wasn't my question though.

A    I don't know whether he had it on at that time, but I know that they wear them in that department.

Q    When Jack called you from wherever this discussion was occurring between Jack and the administration, did you make any recording of the call?

A    No.

Q    Do you have the same cell phone?

A    I think we've all upgraded our cell phones since that time.

Q    You have the same carrier?

A    The carrier I think has changed on its own.  Not by us but like we had like T-Mobile and now it's someone else.  Or we had something and now it's T-Mobile or something like that, but we didn't change recently.

Q    All right.  Do you have the ability to check the account to see how long that conversation

47

occurred?

A    From the school?

Q    Yes.

A    From Jack to me?

Q    Yes.

A    They transfer everything over to this phone, and I didn't delete it.

Q    Can you look at that now?

A    I could try.

Q    It's April 24, 2025.

A    I don't know how easy it to is go back to phone calls like that.

Q    Do you routinely delete your old --

A    No.  I don't.  So it would be a recent phone call that we would go all the way back to, oh, no, it won't show me that.  When I go to recent, actually, no, it's still going.  I wonder how far it will let me go back.  Let's see.  Tell me the date again.

Q    April 24.

A    Of what year?  '25?

Q    Yes.

A    It went back to 2024 so we should be able to

48

find something.  Here we are.  2025.  January.
Close.  We are close.  4/24, Jack.  Info.  The
phone call came in at 9:05 a.m., and it lasted
for two minutes.

Q    Do you have any other calls to or from Jack
within a 15-minute time period of that?

A    And then, no.  Then I called Tom a few minutes
after that.  After he was there.  After he got
to the school.  And then I called the school
later to find out what happened after it all had
ended and everything was over and let them --

Q    Who did you speak with?

A    Someone in the office, not any administrators,
and just said, you know, I'd like to find out
what happened, and I ended up getting a call
back from the Principal.

Q    Mr. O'Rourke?

A    Mr. O'Rourke, and he basically told me exactly
what I knew which was there was just the story
about what happened on the bus.  There was no
evidence of any real gun because I said is Jack
in trouble, like what, that's why I called.
What happened.  Did he do something.  Am I

49

missing something here.

And he basically said no, Jack's not in any trouble.  He didn't do anything wrong.  We have found nothing.  It's all fine.  You know, it was just about the conversation on the bus.

So I said he never said he had a gun, never said he brought one or any of that.  He said no, he never said any of that.  We just heard that he had had one in his car at a previous time, and that's why we felt the need to look, and I was like that's it.  Well, all right then.

Now, we're not friends, me and the Principal.  So it wasn't like we were being chatty with each other.  It was just like okay, so he's not in trouble.  No, he's not in trouble.  We didn't find a gun.  That's it. You're okay, Mrs. Harrington, and that was like okay, my kid's not in trouble, but then I was like but he didn't do anything to make that search reasonable, and that's when I sort of turned like wow, he never gave me any reason for the search.

Q    When you said you weren't friends with

Mr. O'Rourke, were you suggesting simply that you're not friends or was there more to it?  In other words, are you suggesting that there's been discord between of two of you?

A   I think the mask thing, but that, I mean he never like said anything or I think you sort of, when your kid isn't masked, and he's the only kid in the school including students and teachers who isn't masked that you feel that maybe there's some, people don't like your kid or something like that but no.

There's not like, you know, we haven't had words or anything like that, but I'm kind of a protective mother, and I think everyone knows me as that.  So having been a sex offender counselor, I think it makes me more scared than maybe others of what I know could happen.  So I've always been a protective mom so maybe he would know me like that, but like I brought up like school books and things like that that I thought were inappropriate for the library.  They're gone now.  That kind of thing.  So nothing outside of just being a concerned

parent.

Q   Was his response to any of the things that you've called to his attention anything beyond being a concerned principal?

A   I would say more just not wanting to deal with any complaints that I've had.  That's kind of how I -- like he wouldn't remove the books.  I got those books removed through other means, not through my complaint to him.  So he would hear me out, but he wouldn't, I get the feeling it wasn't his thing to talk about the books.  You know.  So I brought it to the school board and went about it that way.

Q   So let me go back to one of my previous questions.  Was there any discord between you and Mr. O'Rourke or did you simply agree to disagree on certain things?

A   Yes.  I think we agreed to disagree.  I don't think we disliked each other because of it.

Q   Okay.  Thank you.  Do you know why Jack didn't record the search of his glove box?

A   I asked him later, and he just said I was just under intense pressure like they were yelling at

me, they were demanding, and they were saying I had no choice and I just felt like under intense pressure, he said.  Because we had hoped he had.

Q   You had hoped what?

A   I had hoped he had recorded it so we would know.

Q   Was Jack suggesting that the administrators and/or Mr. DeTurris were yelling at him and demanding things from him while they were in the parking lot?

A   I don't know about in the parking lot.  Jack said that he had a little argument with the officer and told him to fuck off.  He said I used that "F" word with him.

Q   When did Jack tell Officer DeTurris to fuck off?

A   He said that the administrators were pressuring him heavily, and the officer stood up and like got in his face and basically like, almost was threatening with him, and Jack said don't take that tone with me or something of that nature. You can just fuck off, and I'll leave if you're going to be like that.

And the guy sat right down, he said, and then they continued the conversation, but he

53

said that he tried to get aggressive with him at one point and Jack just wasn't having it.  So he said like I'm literally embarrassed I told him to fuck off.

Q   Did you know Officer DeTurris prior to April 24?

A   No.

Q   Had you ever met him to your knowledge?

A   I don't think I've ever met him before that.

Q   After the search of Jack's glove box, when was the next time you spoke with Jack?

A   Tom drove down there.  I didn't.  So probably not until he got home from school.

Q   And then did you, I'm imagining that you spoke to him about what had happened?

A   Yes.

Q   What if anything did he tell you that you haven't already told me about what happened either when he was speaking with the administration inside or outside at the time of the search of his glove box?

A   I think he just said that very quickly from after getting off the phone, you know, they walked him out to the car and checked his glove

54

box and nothing was there, and he got to go back
to class.

Q    Did Jack ever tell you that he said a phrase,
the phrase, and I'm going to quote it, just give
me a minute.  Sorry about that.  So all you have
to do is look in my glove box and see that I
don't have a gun in my truck.

Did Jack ever tell you that he said that to
Mr. McGinn?

A    No.

Q    Did Jack ever tell you that he told Mr. McGinn
that he could, McGinn could look in his glove
box but the other two meaning DeTurris and
O'Rourke could not?

A    No.

Q    Do you know what the scope of the search was?

A    I understood they wanted to check his glove box.

Q    Was it limited to that?

A    That's what I understood.

Q    Yes.

A    I don't know if they were going to search for
more, but that's what I understood that it was
the glove box they wanted to search.

Q    Do you know who among the three of them, McGinn, O'Rourke, DeTurris, was the one who looked in the glove box?

A    No.  I have no idea.

Q    Do you know where the other two were if there was only one of them looking in the glove box?

A    No.  I would imagine that Jack would have a, like would feel safer with people, but I don't --

        MR. PALTZIK:  Objection.  This is veering into hypotheticals and imaginations.

Q    Okay.  Go ahead.  You can finish.

A    I don't know.  I didn't hear him say that.

Q    Did Jack ever tell you why he felt and the words you used were, and I wrote it down in quotes, "he was under intense pressure when speaking to the administrators"?

A    That's a phrase that we use a lot as a joke like in the family.  Like so if you messed up we'd make a joke and go I'm under intense pressure. So it's kind of a joke so he might have joked about it like that, like I was under intense pressure because it's like a common joke, and

56

that's kind of how we would get away with if we didn't do something we were told to do.  I was under intense pressure, and it would be a joke.

So I'm pretty sure he made the joke that we made before like it was a lot for me.

Q    For how long had that been a standing family joke?

A    Years.

Q    Years?

A    Yes.  We've been joking that way for years.  So I think he made the joke.

Q    When Jack used that phrase you assumed it was part of this long-running family joke?

A    Yes.  Let's say you miss the exit.  I was under, you know.

Q    I got it.  Okay.  Am I correct in understanding that you didn't go to the school that day, April 24th, I mean?

A    That's right.  Tom was actually on his way to work.  So he was like I'm just going to go straight there even though he didn't get invited.  He was like I'm just going to go straight there.  I'm going to leave anyway.

Q       Yes.

A       So he drove straight there and I can see from my phone that I called him a few minutes later and we talked several times.  Like I talked to him three times in a row.

Q       As he's driving to work?

A       Yes.  And dropped calls a few times I'm sure between here and Keene.  You know what I mean.  So could have been the reason I talked to him three times is that it dropped.  Not necessarily that it was more questions or demands.

Q       From your conversation with Thomas when he's in the car and going either to the school or from the school to work, did you learn any more about the facts of the conversation that happened between Jack and administrators or the search?

A       I think Tom's visit there was really short so I didn't learn anything more from Tom.

Q       Did he ever get out of the car while he was on school grounds?

A       He said, he told me that, pretending I'm Tom.  I said to them you better have followed the law or something like that.  Some phrase of you better

have done this right or something of that nature. And that was all I think he really added at all. He didn't really make it sound like he got out and got engaged with anyone at all. He was just checking. It had already been searched, and all right, I've got to head to work. You better not have done something wrong. And that was it. So I don't know who said that to.

Q   If I asked you this previously, I apologize, but since the events occurred, the conversation with the administrators and the search of the glove box, has Jack provided any more detail about any of those events that we haven't already covered here today?

A   We talked, you know, I talked to Jack about it multiple times, but I don't think any detail was added. I spoke to the school principal who then reviewed it again with me, you know, not long after, couple hours maybe. I had called and then I think he called me back, and he basically just went over again, you know, we heard from a past time he had had one in his glove

compartment from a previous time and we wanted to check.

So he's not in trouble?  No, he's not in trouble.  He's not going to get in trouble?  No. I was just worried that he was going to get written up for something or that he had done something wrong, and he basically put me at ease and said he's not in any trouble.  Everything's fine.  We had to search for whatever reason and I was like okay.

Q    Right.  It wasn't entirely responsive to my question.

A    Sorry.

Q    That's quite all right.  I just want to circle back to it to make sure we got an answer.  So since the events occurred, have you learned any additional facts about either the conversation that happened with the administrators or the search of the glove box that we haven't already discussed?

A    I don't believe so.

Q    Okay.  I don't have any other questions for you.

A    Thank you.

EXAMINATION

BY MR. PALTZIK:

Q    Just one question.  Betsi, you talked about a running family joke?

A    Yes.

Q    Was this situation of Jack having his truck searched, was it a joke to you?

A    No.  No.  Just the, when we say I'm under intense pressure, just that phrase is a joke.  But no, this was not a joke.

Q    Okay.  So in your view and your husband's view, the situation at school for which you received the phone call, the truck search, was it a joke or not a joke?

A    Not a joke.

Q    You were taking it seriously?

A    Very.

Q    Okay.  Could you just describe how seriously you took it?

A    Well, I work in law enforcement so carrying a gun is a really, really important thing that safety is just so paramount.  I don't want anyone to get hurt.  So we've just been really,

61

I don't know, sticklers about having and owning a gun for us and our children.  You know.  It's just not a joke.  We've just always taken it seriously.  Target shooting.  Everything that we do.  Not a joke.  We don't do it totally for fun.  Even though there is some fun in target shooting, it's more for practice and other reasons.

Q    That's it.  I'm good.

        MS. FRIEDMAN:  Okay.  I have no other questions.

            (Deposition ended at 1:31 p.m.)

62

I have carefully read the foregoing deposition, and the answers made by me are true.

_____
BETSIANNE SUZOR HARRINGTON

STATE OF _____

_____, SS.

At_____on the

_____ day of _____ A.D. 2026, personally appeared the above-named BETSIANNE SUZOR HARRINGTON and made oath that the foregoing answers subscribed by her are true.

Before me,

_____
Notary Public

63

                    C E R T I F I C A T E

        I, Cynthia Foster, Registered Professional

Reporter and Licensed Court Reporter, duly authorized

to practice Shorthand Court Reporting in the State of

New Hampshire, hereby certify that the foregoing

pages are a true and accurate transcription of my

stenographic notes of the deposition of BETSIANNE

SUZOR HARRINGTON who was first duly sworn by me on

March 25, 2026, for use in the matter indicated on

the title sheet, as to which a transcript was duly

ordered;

            I further certify that I am neither

attorney nor counsel for, nor related to or employed

by any of the parties to the action in which this

transcript was produced, and further that I am not a

relative or employee of any attorney or counsel

employed in this case, nor am I financially

interested in this action.


                        _____
                        Cynthia Foster, LCR #14

64

E R R A T A

I, the undersigned, BETSIANNE SUZOR HARRINGTON, have read the transcript of my deposition held on March 25, 2026, in the matter of Harrington v. Crawford, et al, and the same is true and correct to the best of my knowledge, with the exception of the following corrections listed:

PAGE/LINE   CORRECTION AND REASON FOR CORRECTION

_____

_____

_____

See attached sheet(s) for additional information:

___Yes___No


                        _____
                        BETSIANNE SUZOR HARRINGTON


STATE OF _____)
                     ) ss.:
COUNTY OF _____)


        Subscribed and sworn to before me this _____ day of _____, 2026.


                        _____
                        Notary Public

My commission expires:

_____

*AVICORE Reporting & Video*
*15 Constitution Drive, Suite 1A, Bedford, NH  03110 * (603) 666-4100*